IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

CRAIG A. JOHNSON,

                         Petitioner,                         **8:18CV124**

vs.

SCOTT FRAKES,                                               **MEMORANDUM
                                                              AND ORDER**

                         Respondent.

This matter is before the court on Petitioner Craig A. Johnson's ("Petitioner" or "Johnson") Petition for Writ of Habeas Corpus. (Filing No. 1.) For the reasons that follow, Petitioner's habeas petition is denied and dismissed with prejudice.

## I. CLAIMS

Summarized and condensed, and as set forth in the court's initial review order (Filing No. 6), Petitioner asserted the following claims that were potentially cognizable in this court:

Claim One:        Petitioner was denied effective assistance of counsel because his trial counsel did not allow him to exercise his constitutional right to testify in his own behalf.

Claim Two:        Petitioner, an African-American, was denied his rights to equal protection and due process when the prosecution exercised a preemptory challenge against the only African American individual in the jury pool.

(Filing No. 6 at CM/ECF p. 1.)

# II. BACKGROUND

## A. Conviction and Sentence

The court states the facts as they were recited by the Nebraska Supreme Court in *State v. Johnson*, 290 Neb. 862, 862 N.W.2d 757 (2015). (Filing No. 7-3.) *See Bucklew v. Luebbers*, 436 F.3d 1010, 1013 (8th Cir. 2006) (utilizing state court's recitation of facts on review of federal habeas petition).

In the spring of 2011, April Smith separated from her husband, Edward Smith (Ed), and began dating Johnson. At some point, Johnson began working near Sidney, Nebraska, at a pipe distributor for oil rig operations. April managed a convenience store near the distributor and lived in a duplex within eyesight of the store. Johnson moved in with April about the end of the summer. But April continued to maintain a close relationship with Ed, and Ed continued to help her with some financial obligations and the maintenance of her white van, which they jointly owned.

For Thanksgiving 2011, April invited Ed to have dinner with herself, Johnson, and April's nephew and his family. Just before Thanksgiving, Johnson told a coworker that he was upset that April had invited Ed and that he would kill her if she ever left him to go back to Ed. During the Thanksgiving gathering, Ed refused Johnson's offer to repair April's van.

On Saturday morning, December 10, 2011, Ed went to April's duplex and took her van to repair the brakes. He returned it around noon. Ed was a truckdriver and left shortly after returning the van to go to Texas.

Johnson worked on Saturday morning. His supervisor said that Johnson asked to leave work early because he heard that Ed was going to April's house. She said that Johnson frequently mentioned meetings between April and Ed and was upset and jealous about their relationship. On Saturday morning, he told his supervisor that if he ever caught them together, he would "beat the shit out of both of them."

His supervisor advised him to leave if he was unhappy, and he apologized for his remark. On Saturday afternoon, Johnson called a coworker and asked whether he could come over because he and April were fighting, but the coworker had plans to leave town.

Later that evening, April's nephew, his wife, and their children went to visit April at her duplex. Robert Gray, April's nephew, said that Johnson was drinking beer and was unusually quiet most of the evening. Robert and his wife both said that Johnson was upset about other men flirting with April at the convenience store and about Ed's repairing the brakes on April's van. Robert's wife described Johnson's demeanor as angry and said that his and April's interactions were tense; they went into the kitchen to talk privately a couple of times during the evening. Just before Robert and his family left around midnight, April and Johnson had started to argue. April's neighbors reported hearing loud voices and arguing around 1 or 2 a.m. They recognized Johnson's voice from previous fights between April and Johnson when they had tried to intervene. A neighbor in the adjacent duplex said that the arguing continued for 30 to 45 minutes and that she heard "a couple of thuds."

On Sunday morning, December 11, 2011, April's employer saw her white van in front of her duplex while he was at the convenience store. At about 11:50 a.m., a sheriff's officer was at the convenience store to respond to an alarm that had gone off. While he was checking the outside of the building, Johnson pulled up in April's van. Johnson said that his girlfriend was the manager and that they had received a call from the alarm company. He told the officer that his girlfriend was having back problems and preparing to resign her position. Johnson opened the door with a key and deactivated the alarm.

Meanwhile, Robert and his wife tried to call April about 11 a.m. and noon on Sunday, but she did not answer or return their calls, which was unusual. They went to April's duplex a couple of times that afternoon, but the van was gone, she did not respond to knocks, the blinds were closed, and the deadbolt was locked, which was also unusual. Johnson's pickup was parked in front of the duplex. They returned to

April's duplex that night but could not see inside. About 8:45 p.m., a security camera filmed Johnson while he was purchasing gas for a white van in Chapman, Nebraska, which is about 3 hours 45 minutes from Sidney.

On Monday morning, December 12, 2011, Robert and his wife contacted the sheriff's department. April's employer had also contacted the office when she did not show up for work. Johnson had requested time off in advance for a doctor's appointment.

At about 8 a.m. on Monday, two officers went to the duplex to check on April. When she did not answer their knocks, the officers spoke to people who might know where she was and learned that Johnson had taken the day off. They eventually broke into the duplex and found April's body lying face down in the living room. A chief deputy sheriff believed she had been dead for quite a while from the appearance of her body. The officers could see that her hands and feet were tied, and there was blood on the couch beside her and on her arms and legs. After determining that April was dead, the sheriff's officers secured the duplex until State Patrol investigators could help.

A witness testified that while he was at a gas station in Brooklyn, Iowa, on Tuesday, December 13, 2011, a driver in a white van—whom he identified as Johnson—asked him for money to pay for gas. The van had South Dakota plates on it, even though Johnson had said he was from Sterling, Nebraska. Johnson was emotional and told the witness that he was having relationship problems and trying to get to a job in Illinois.

Two days later, on December 15, 2011, a sheriff's officer in Jackson County, Michigan, pulled over April's white van with South Dakota license plates for a traffic violation. Johnson was driving the van. But when the officer got out of his vehicle, Johnson accelerated back into traffic. A high-speed chase ensued, which ended when other officers set up "stop sticks" to puncture the van's tires. Johnson initially refused to get out, so the officers arrested and handcuffed him. The arresting

officer found the van's Nebraska license plates inside and learned that it was stolen from the scene of a homicide, but he did not say this to Johnson. The South Dakota plates did not match the van's vehicle identification number. Later, while the officer was booking Johnson, he blurted out, "'What do you want from me I'm wanted for murder.'"

When Nebraska investigators learned that Michigan officers had arrested Johnson, they went to Michigan to bring Johnson back to Nebraska. They also obtained a search warrant to photograph his body and obtain fingernail scrapings. The photographs did not show any injuries. But when they attempted to scrape his right-hand fingernails, Johnson became confrontational and began to dig at his right-hand nails, discarding the debris on the floor, until the officers could restrain him. The deputy sheriff could not obtain scrapings from his right hand. The scrapings he obtained from Johnson's left hand tested negative for the presence of blood, and DNA testing showed nothing of evidentiary value.

During the return trip to Nebraska, Johnson told a Nebraska investigator that he had planned to see an old friend in Michigan and then turn himself in. Later, he said that "dope would play a role in the investigation."

When the Nebraska investigators searched the van, they found Johnson's T-shirt and athletic shoes with dark stains that they believed to be blood. The stains on both the T-shirt and shoes tested positive for blood, and the DNA profile extracted from these stains matched April's profile. The investigators traced the South Dakota license plates to a vehicle in a Sioux Falls, South Dakota, salvage yard.

### 1. Jury Selection

During jury selection, the State used one of its peremptory challenges to strike juror No. 8. In a juror questionnaire, she listed her race or ethnicity as African-American and Hispanic Latino. Johnson is African-American, and juror No. 8 was

the only minority represented in the jury pool. The defense challenged the strike in a side bar.

During an in camera discussion, the prosecutor explained that the juror had indicated on her questionnaire that she was acquainted with April because April was a customer at a pharmacy where the juror worked. The prosecutor believed that the juror could have knowledge related to April's use of drugs—evidence that the prosecutor believed was irrelevant but knew that Johnson would use in his defense.

The defense responded that the State's proffered reason was pretextual and irrational. The defense argued that the prosecutor had not questioned the juror about her knowledge, i.e., whether she had filled any of April's prescriptions. The State responded that it did not want to highlight the reason for striking her. The court overruled the objection.

## 2. Evidence Presented of the Crime Scene and April's Injuries

The investigators found blood in the main bedroom, bathroom, a second bedroom, and the dining room. They found dark-colored vomit in a trash can by the bed, and blood smeared on and around the toilet, suggesting that April had vomited there too. They believed the evidence showed signs of a struggle throughout the duplex or that April was moving from place to place in an effort to survive.

When they turned over April's body, they saw a ligature abrasion on her neck, a hand wound, a facial wound, and a gaping wound in the left side of her abdomen about 2 inches long. They also found a clump of April's hair by her body and in other parts of the duplex, and several of her acrylic fingernails.

Inside a kitchen trash can, investigators found a white trash bag, a cell phone, a black baseball cap, and two blue knit hats. The cell phone belonged to April. The trash bag had blood splattered on the end by the drawstring, and a V-shaped piece was ripped out of it. Investigators found the ripped-out piece beside April's body. A

Nebraska State Patrol investigator stated that the trash bag appeared to have an imprint in it where it had been stretched over something. He believed the imprint was of a human face. He opined that the blood pattern indicated that the blood had been aspirated or exhaled onto the bag. The pathologist who performed the autopsy concluded that the pinpoint hemorrhages found on April's mouth could have been caused by strangulation or suffocation. The ligature abrasion on her neck indicated strangulation. A forensic scientist found a fingerprint on the trash bag that matched one of Johnson's fingerprints. DNA testing of the blood on the bag and the ripped-out piece produced DNA profiles that matched April's profile.

Investigators also found a couple of knives in the sink, one of which had an 8-inch blade and a red substance dried on it. No identifiable fingerprints were found on the knife. The knife tested positive for the presence of blood; DNA testing of the knife handle and blade produced DNA profiles from a single source that matched April's profile and excluded Johnson.

During the deputy sheriff's testimony, the court admitted, without objection, a photograph showing the position of April's body face-down beside the couch. During the other investigators' testimonies, the State submitted, without objection, three photographs of blood found in the duplex. But Johnson objected to the State's offer of eight more photographs of April's body and the crime scene as cumulative and an attempt to inflame the jurors' passions. The State argued that photographs gave the jurors a perspective of the body's location in the house and the violent scene that investigators encountered. The court overruled Johnson's objections. After this ruling, the court admitted two more photographs from the crime scene, without objection, showing April's bound hands—including the wound in her palm and the ligature abrasions around her wrists—and the stab wound to her abdomen.

The evidence showed that April had been prescribed hydrocodone pills for back problems, and investigators found three prescription bottles with these pills in her bedroom: one on the floor, one on her bed, and one in a plastic bag with other prescription bottles. But the State presented witnesses who testified that April had

not abused her prescription drugs and was not involved in drug dealing. The pathologist stated that the toxicology report showed April had a toxic level of hydrocodone in her body, sufficient to cause death, and also some amount of a barbiturate. He stated that this evidence did not show that April had abused the drugs. But the evidence did show that she had taken the drugs close to the time of her death.

In addition to the stab wound and ligature abrasions, April had multiple bruises and abrasions on her face and body. The hand wound could have been a defensive wound. The stab wound in her abdomen was 7 1/2 inches deep and punctured her small intestine in a couple of places. It would not have caused immediate death, but it would have caused vomiting. The pathologist believed that April was alive after sustaining the stab wound to her abdomen because an inflammatory response had started in her body. The State submitted, without objection, several autopsy photographs of the injuries to April's body. The pathologist opined that her death was a homicide caused by the stab wound to her abdomen and suffocation, with a contributing cause of multiple drug toxicity.

The State's DNA expert testified about her testing of biological samples that investigators took from the crime scene. The court overruled Johnson's continuing objections to three of the expert's inconclusive testing results and her testimony about them. Johnson objected that under Neb. Evid. R. 402 and 403, the evidence was irrelevant and its potential for unfair prejudice outweighed its probative value.

### 3. Verdict and Sentencing

Johnson was found guilty of first degree murder, use of a weapon to commit a felony, and possession of a deadly weapon by a prohibited person. The court sentenced him to prison terms of, respectively, life, 40 to 50 years, and 10 to 20 years, with all terms to be served consecutively. Johnson timely appealed.

## B. Direct Appeal

Johnson appealed his convictions to the Nebraska Supreme Court on February 5, 2014. ([Filing No. 7-1](.).) Johnson was represented both at trial and on direct appeal by lawyers from the same office. As relevant here, Johnson argued that the state district court erred in overruling his *Batson*[1] challenge to the State's use of a peremptory strike against the only African-American prospective juror.[2] ([Filing No. 7-5](.).) The Nebraska Supreme Court affirmed Johnson's convictions and sentences. *Johnson*, 290 Neb. at 885, 862 N.W.2d at 775. ([Filing No. 7-3 at CM/ECF p. 17](.).) With respect to Johnson's *Batson* claim, the Nebraska Supreme Court concluded that the evidence was sufficient to support the finding that the prosecutor had a legitimate race-neutral explanation for striking the juror. *Johnson*, 290 Neb. at 875, 862 N.W.2d at 768-69. ([Filing No. 7-3 at CM/ECF p. 10](.).)

## C. Postconviction Action

Johnson filed a verified motion for postconviction relief on January 19, 2016. ([Filing No. 7-10 at CM/ECF pp. 2-28](.).) Johnson alleged multiple instances of ineffective assistance of counsel. As relevant here, Johnson alleged that trial counsel was ineffective in failing to allow Johnson to testify at trial. (*[Id.](.)* at CM/ECF pp. 4-22.)

In a written order entered December 19, 2016, the state district court denied postconviction relief on all grounds without an evidentiary hearing. (*[Id.](.)* at CM/ECF pp. 32-42.) Concerning Johnson's right to testify, the district court ruled that Johnson

---

[1] *See [Batson v. Kentucky](.)*, 476 U.S. 79 (1986); *[State v. Nave](.)*, 284 Neb. 477, 821 N.W.2d 723 (2012).

[2] In his brief, Johnson also assigned that the state district court erred in (1) admitting cumulative, gruesome autopsy photographs; and (2) admitting evidence of inconclusive DNA testing results. ([Filing No. 7-5](.).)

merely provided generalizations and factual conclusions that he would have testified that he did not commit the murder and that he would have provided a reason why he was found in Michigan. (*Id.* at CM/ECF p. 41.) As a result, the court found no demonstration of prejudice as to the performance of trial and appellate counsel as to this issue. (*Id.*)

Johnson appealed to the Nebraska Supreme Court. (Filing No. 7-2; Filing No. 7-7.) In a published opinion, the Nebraska Supreme Court affirmed the state district court's decision to deny postconviction relief. *State v. Johnson*, 298 Neb. 491, 904 N.W.2d 714 (2017). (Filing No. 7-4.) The mandate issued on January 11, 2018. (Filing No. 7-2 at CM/ECF p. 2.)

## D. Habeas Petition

Johnson timely filed his Petition in this court on March 21, 2018. (Filing No. 1.) In response to the Petition, Respondent filed an Answer (Filing No. 10), a Brief (Filing No. 11), and the relevant state court records (Filing No. 7). Respondent argues that Claim One is procedurally defaulted and Claim Two is without merit. (Filing No. 11.) Johnson filed a brief (Filing No. 12) in response to Respondent's Answer. Respondent notified the court that he would not file a reply brief. (Filing No. 13.) This matter is fully submitted for disposition.

## III. OVERVIEW OF APPLICABLE LAW

There are two strands of law that are applicable here. They are (1) exhaustion and procedural default and (2) the deference that is owed to the state courts when a federal court reviews the factual or legal conclusions set forth in an opinion of a state court. The court elaborates upon those concepts next, so that it may apply them later in a summary fashion as it reviews Johnson's claims.

**A. Exhaustion and Procedural Default**

As set forth in 28 U.S.C. § 2254:

> (b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
>
>> (A) the applicant has exhausted the remedies available in the courts of the State; or
>>
>> (B)(i) there is an absence of available State corrective process; or
>>
>> (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

The United States Supreme Court has explained the habeas exhaustion requirement as follows:

> Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts . . . state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.

O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).

A state prisoner must therefore present the substance of each federal constitutional claim to the state courts before seeking federal habeas corpus relief. In Nebraska, "one complete round" ordinarily means that each § 2254 claim must have been presented in an appeal to the Nebraska Court of Appeals, and then in a petition for further review to the Nebraska Supreme Court if the Court of Appeals

rules against the petitioner. *See Akins v. Kenney*, 410 F.3d 451, 454-55 (8th Cir. 2005).

"In order to fairly present a federal claim to the state courts, the petitioner must have referred to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue in a claim before the state courts." *Carney v. Fabian*, 487 F.3d 1094, 1096 (8th Cir. 2007) (internal citation and quotation omitted). Although the language need not be identical, "[p]resenting a claim that is merely similar to the federal habeas claim is not sufficient to satisfy the fairly presented requirement." *Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999). In contrast, "[a] claim has been fairly presented when a petitioner has properly raised the 'same factual grounds and legal theories' in the state courts which he is attempting to raise in his federal habeas petition." *Wemark v. Iowa*, 322 F.3d 1018, 1021 (8th Cir. 2003) (citation omitted).

Where "no state court remedy is available for the unexhausted claim—that is, if resort to the state courts would be futile—then the exhaustion requirement in § 2254(b) is satisfied, but the failure to exhaust 'provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default.'" *Armstrong v. Iowa*, 418 F.3d 924, 926 (8th Cir. 2005) (quoting *Gray v. Netherland*, 518 U.S. 152, 162 (1996)).

To be precise, a federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Also, a credible showing of actual innocence may allow a prisoner to pursue his constitutional claims on the merits notwithstanding the existence of a procedural bar

to relief. *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013). To invoke the actual innocence exception, a petitioner "must show that in light of all the evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Jennings v. United States*, 696 F.3d 759, 764-65 (8th Cir. 2012) (quoting *Schlup v. Delo*, 513 U.S. 298, 327, (1995)). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Id.* (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)).

### B. Nebraska Law Relevant to Procedural Default

Under Nebraska law, you don't get two bites of the postconviction apple; that is, "[a]n appellate court will not entertain a successive motion for postconviction relief unless the motion affirmatively shows on its face that the basis relied upon for relief was not available at the time the movant filed the prior motion." *State v. Ortiz*, 670 N.W.2d 788, 792 (Neb. 2003). Additionally, Nebraska has a statute of limitations for bringing postconviction actions that is similar to federal law. It reads:

> (4) A one-year period of limitation shall apply to the filing of a verified motion for postconviction relief. The one-year limitation period shall run from the later of:
>
> > (a) The date the judgment of conviction became final by the conclusion of a direct appeal or the expiration of the time for filing a direct appeal;
> >
> > (b) The date on which the factual predicate of the constitutional claim or claims alleged could have been discovered through the exercise of due diligence;
> >
> > (c) The date on which an impediment created by state action, in violation of the Constitution of the United States or the Constitution of Nebraska or any law of this state, is removed, if the prisoner was prevented from filing a verified motion by such state action;

(d) The date on which a constitutional claim asserted was initially recognized by the Supreme Court of the United States or the Nebraska Supreme Court, if the newly recognized right has been made applicable retroactively to cases on postconviction collateral review; or

(e) August 27, 2011.

Neb. Rev. Stat. § 29-3001(4) (West).

## C.  Deferential Standard Under 28 U.S.C. § 2254(d)

When a state court has adjudicated a habeas petitioner's claim on the merits, there is a very limited and extremely deferential standard of review both as to the law and the facts. *See* 28 U.S.C. § 2254(d). Section 2254(d)(1) states that a federal court may grant a writ of habeas corpus if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). As explained by the Supreme Court in *Williams v. Taylor*, 529 U.S. 362 (2000), a state court acts contrary to clearly established federal law if it applies a legal rule that contradicts the Supreme Court's prior holdings or if it reaches a different result from one of that Court's cases despite confronting indistinguishable facts. *Id.* at 405-06. Further, "it is not enough for [the court] to conclude that, in [its] independent judgment, [it] would have applied federal law differently from the state court; the state court's application must have been objectively unreasonable." *Rousan v. Roper*, 436 F.3d 951, 956 (8th Cir. 2006).

With regard to the deference owed to factual findings of a state court's decision, section 2254(d)(2) states that a federal court may grant a writ of habeas corpus if a state court proceeding "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Additionally, a federal court must presume that a factual determination made by the state court is correct, unless the

petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

As the Supreme Court noted, "[i]f this standard is difficult to meet, that is because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The deference due state court decisions "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Id.* Indeed, "[i]t bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.*

However, this high degree of deference only applies where a claim has been adjudicated on the merits by the state court. *See Brown v. Luebbers*, 371 F.3d 458, 460 (8th Cir. 2004) ("[A]s the language of the statute makes clear, there is a condition precedent that must be satisfied before we can apply the deferential AEDPA [Antiterrorism and Effective Death Penalty Act] standard to [the petitioner's] claim. The claim must have been 'adjudicated on the merits' in state court.").

The Eighth Circuit clarified what it means for a claim to be adjudicated on the merits, finding that:

> AEDPA's requirement that a petitioner's claim be adjudicated on the merits by a state court is not an entitlement to a well-articulated or even a correct decision by a state court. Accordingly, the postconviction trial court's discussion of counsel's performance—combined with its express determination that the ineffective-assistance claim as a whole lacked merit—plainly suffices as an adjudication on the merits under AEDPA.

*Worthington v. Roper*, 631 F.3d 487, 496-97 (8th Cir. 2011) (internal quotation marks and citations omitted).

The court also determined that a federal court reviewing a habeas claim under AEDPA must "look through" the state court opinions and "apply AEDPA review to the 'last reasoned decision' of the state courts." *Id.* at 497. A district court should do "so regardless of whether the affirmance was reasoned as to some issues or was a summary denial of all claims." *Id.*

## IV. DISCUSSION

### A. Claim One

Johnson claims that he was denied effective assistance of counsel because his trial counsel did not allow him to exercise his constitutional right to testify in his own behalf. As to this claim, the Nebraska Supreme Court wrote:

> In assessing postconviction claims of ineffective assistance of counsel for failure to call a particular witness, we have upheld the dismissal without an evidentiary hearing where the motion did not include specific allegations regarding the testimony which the witness would have given if called.

> Johnson's motion merely alleges that if he were allowed to testify, he "would have refuted the allegations against him" and he "wanted to explain to the jury why he traveled to Michigan." These reasons are mere conclusions of fact and are not sufficiently detailed to constitute factual allegations which, if proved, constitute an infringement of the movant's constitutional rights. Further, Johnson's allegations are insufficient to show a reasonable probability that the outcome would have been different but for the failure to call him as a witness.

*Johnson*, 298 Neb. at 507, 904 N.W.2d at 728 (footnote omitted). (Filing No. 7-4 at 13.)

Although Claim One was raised in Johnson's postconviction motion and subsequent appeal, the Nebraska Supreme Court did not reach the merits of this

claim because Johnson made insufficient allegations in his postconviction motion. *Johnson*, 298 Neb. at 507, 904 N.W.2d at 728. (Filing No. 7-4 at 13.) *See State v. Dragon*, 287 Neb. 519, 523, 843 N.W.2d 618, 623 (2014) ("If a postconviction motion alleges only conclusions of fact or law, or if the records and files in the case affirmatively show that the defendant is entitled to no relief, the court is not required to grant an evidentiary hearing"). Therefore, Claim One is procedurally defaulted pursuant to an independent and adequate state procedural rule. *See Hunt v. Houston*, 563 F.3d 695, 703 (8th Cir. 2009) ("Federal courts generally will not review claims that a state court has refused to consider because of the petitioner's failure to satisfy a state procedural requirement"); *Sing v. Frakes*, No. 8:15CV134, 2016 WL 3248244, at *5 (D. Neb. June 13, 2016) (same); *Ildefonso v. Gage*, No. 4:13CV3110, 2016 WL 1092468, at *9 (D. Neb. Mar. 21, 2016), *certificate of appealability denied* (Sept. 15, 2016) (the Nebraska Supreme Court's decision to refuse to consider claims that alleged only conclusions of fact or law was based on a firmly established state procedural rule; in Nebraska, if a postconviction motion alleges only conclusions of fact or law, then the court is not required to grant an evidentiary hearing). The claim is now procedurally defaulted, not unexhausted, because the Nebraska courts would not entertain a successive postconviction motion based on this claim since it was raised in his postconviction appeal to the Nebraska Supreme Court. Furthermore, any successive postconviction motion filed by Johnson would also be barred by Nebraska's statute of limitations.

Johnson has not demonstrated cause or prejudice for the default. Moreover, there is no reason to believe Johnson is actually (meaning factually) innocent or that some miscarriage of justice took place. The court has carefully examined the record. The evidence was sufficient to convict Johnson beyond a reasonable doubt. As such, Claim One is dismissed.

**B. Claim Two**

Johnson, an African-American, claims he was denied his rights to equal protection and due process when the prosecution exercised a preemptory challenge

against the only African-American individual in the jury pool. In addressing this claim on direct appeal, the Nebraska Supreme Court reasoned and determined as follows:

> Johnson assigns that the court erred in overruling his *Batson* challenge to the prosecutor's use of a peremptory challenge to remove juror No. 8, the only prospective juror of African-American descent. He contends that the prosecutor's proffered reason for the challenge was pretextual. He argues that the prosecutor did not ask juror No. 8, who worked at the pharmacy where April filled her prescriptions, whether she possessed any special knowledge about April. Johnson also points out that the juror had stated that she could be impartial on her questionnaire. He contends that these facts raised an inference that the prosecutor sought her removal because of her race. We disagree.

> A prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, if that reason is related to his view concerning the outcome of the case. But under *Batson v. Kentucky*, a peremptory challenge to remove a prospective juror for a racially discriminatory reason violates the Equal Protection Clause. Determining whether a prosecutor impermissibly sought to remove a prospective juror based on race is a three-step process:

>> First, a defendant must make a prima facie showing that the prosecutor exercised a peremptory challenge because of race. Second, assuming the defendant made such a showing, the prosecutor must offer a race-neutral basis for striking the juror. And third, the trial court must then determine whether the defendant has carried his or her burden of proving purposeful discrimination. The third step requires the trial court to evaluate the persuasiveness of the justification proffered by the prosecutor. But the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.

> Once a prosecutor has offered a race-neutral explanation for a peremptory challenge and the trial court has decided the ultimate

question of intentional discrimination, the preliminary issue of whether the defendant made a prima facie showing that the challenge was racially motivated is moot. So we determine only whether the prosecutor's reasons were race neutral and whether the trial court's final determination regarding purposeful discrimination was clearly erroneous. We review de novo the facial validity of an attorney's race-neutral explanation for using a peremptory challenge as a question of law. We review for clear error a trial court's factual determinations whether an attorney's race-neutral explanation is persuasive and whether his or her use of a peremptory challenge was purposefully discriminatory.

Under the second step of a *Batson* inquiry, a prosecutor must present a comprehensible reason for using a peremptory strike against a prospective juror in response to a *Batson* challenge. But in determining whether the explanation is race-neutral, a court is not required to reject the explanation because it is not persuasive, or even plausible; it is sufficient if the reason is not inherently discriminatory. Under our de novo review of the prosecutor's proffered explanation for the peremptory challenge, we conclude that his explanation was not inherently discriminatory.

Whether a prosecutor's explanation for using a peremptory strike against a prospective juror is pretextual falls within the trial court's ultimate factual determination in the third step of the *Batson* inquiry: "[W]hether an attorney's race-neutral explanation for a peremptory challenge should be believed presents a question of fact." A trial court's determination that the explanation was race-neutral frequently involves its evaluation of a prosecutor's credibility, which requires deference to the court's findings absent exceptional circumstances.

Here, the prosecutor explained that he did not want to ask juror No. 8 whether she had knowledge of April's drug use because the questioning would have emphasized his reason for seeking her removal. The record supports his belief that such questions could have raised concerns in the jurors' minds about the validity of Johnson's defense. In his opening statement, Johnson suggested that the evidence would show April was probably addicted to hydrocodone and could have been involved with dangerous individuals who killed her. Because the prosecutor explained

that he knew Johnson would rely on April's drug use as a defense, his decision to not question juror No. 8 about her knowledge of April's drug use did not show that his proffered reason was pretextual. Moreover, the prosecutor denied that race was a factor in his decision and argued that if not for juror No. 8's potential knowledge about the case, he would have "like[d] her" as a juror. He noted that she had recently served on a jury that had found the defendant guilty. The court was not clearly wrong in finding that this testimony was credible.

*Johnson*, 290 Neb. at 872-75, 862 N.W.2d at 767-69 (footnotes omitted).

Johnson asserts that the prosecution's reason for striking juror No. 8 was pretextual because that juror was the "lone minority in the jury pool." (Filing No. 12 at CM/ECF p. 5.) The record, however, supports the Nebraska Supreme Court's determination that the trial court did not err in overruling Johnson's *Batson* objection. Where, as here, the state court makes findings of fact that the prosecutors were not racially motivated in making their strikes, those factual findings "shall be presumed to be correct" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. 2254(e)(1); *see also Purkett v. Elem*, 514 U.S. 765, 769 (1995) (quoting *Marshall v. Lonberger*, 459 U.S. 422, 432 (1983)). This is because "evaluation of the prosecutor's state of mind based on demeanor and credibility lies particularly within a trial judge's province." *Hernandez v. New York*, 500 U.S. 352, 365 (1991) (plurality opinion).

Johnson has failed to present "clear and convincing evidence" demonstrating that the Nebraska Supreme Court's denial of Johnson's *Batson* claim resulted in "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or in "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d)(1) and (2); *Batson*, 476 U.S. at 98 (credibility determinations regarding

race-neutral reasons for strikes are left for the state courts to decide). Thus, Johnson is entitled to no relief on this claim.

## V.  CERTIFICATE OF APPEALABILITY

A petitioner cannot appeal an adverse ruling on his petition for writ of habeas corpus under § 2254 unless he is granted a certificate of appealability. 28 U.S.C. § 2253(c)(1); 28 U.S.C. § 2253(c)(2); Fed. R. App. P. 22(b)(1). The standards for certificates (1) where the district court reaches the merits or (2) where the district court rules on procedural grounds are set forth in *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). The court has applied the appropriate standard and determined that Petitioner is not entitled to a certificate of appealability.

IT IS THERFORE ORDERED that the habeas corpus petition (Filing No. 1) is denied and dismissed with prejudice. No certificate of appealability has been or will be issued. Judgment will be issued by separate document.

Dated this 2nd day of January, 2019.

BY THE COURT:

s/ *Richard G. Kopf*
Senior United States District Judge